**IN THE UNITED STATES COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

**R. SCOTT APPLING,**

       **Appellant,**                         **CASE NO. 3:15-CV-031**

     **vs.**

**LAMAR, ARCHER & COFRIN, LLP,**

       **Appellee.**

---

On Appeal from the United States Bankruptcy Court
For the Middle District of Georgia – Athens Division
Chapter 7 Proceeding No. 13-30083-JPS
Adversary Proceeding No. 13-3042

---

## <u>BRIEF OF APPELLEE</u>

David W. Davenport
Attorney for Appellee
Lamar Archer & Cofrin, LLP
50 Hurt Plaza, Suite 900
Atlanta, GA 30303
Telephone 404- 577-1777
Fax 404- 577-9490

## **<u>TABLE OF CONTENTS</u>**

Table of Authorities                                                                              ii

Statement of the Case                                                                         1

     Statement of Facts                                                             1

Summary of the Argument                                                             11

Argument and Citation of Authorities                                         11

     The Bankruptcy Court Correctly Determined That Appellee has a Non-Dischargeable Claim Against Appellant                          11

     The Bankruptcy Court Correctly Ruled That Appellant Made a False Representation as to a Specific Asset, Not as to his "Financial Condition."                                                                    13

     The Bankruptcy Court Properly Found Appellee's Claim Non-Dischargeable Because of Appellant's False Pretenses, False Representations and/or Actual Fraud                                                 18

     The Bankruptcy Court Correctly Found Justifiable Reliance by Appellee   24

     The Bankruptcy Court Correctly Determined That Appellant's Entire Indebtedness to Appellee Is Non-dischargeable                    26

Conclusion                                                                                       28

Certificate of Service                                                                       30

i

# <u>TABLE OF AUTHORITIES</u>

<u>Caselaw</u>

*In re Alicea*, 230 B.R. 492 (Bankr.S.D.N.Y. 1999)                15, fn. 8

*Allison v. Roberts*, 960 F.2d 481 (5th Cir. 1992)                12

*In re Anderson*, 181 B.R. 943 (Bankr.D.Minn. 1995)                20

*Baker v. Sharpe (In re Sharpe)*, 351 B.R. 409
(Bankr.N.D.Tex. 2006)                13, fn. 6, 14, 17, fn. 9

*Bancorpsouth Bank v. Calloway (In re Callaway)*, 2006 WL 6589022
(Bankr.N.D.Ga. 2006)                13, 4,16, 17

*Bandi v. Becnel (In re Bandi),* 683 F.3d 671 (5th Cir. 2012), *cert.
denied* 133 S. Ct.  845 (2013)                14,16, 17

*Brinsfield v. Robbins*, 183 Ga. 258,188 S.E. 7 (1936)                22

*In re Bucciarelli*, 429 B.R. 372 (Bankr. N.D.Ga. 2010)                13

*Bullock v. Bankchampaign*, 133 S.Ct. 1754 (2013)                21

*Cadwell v. Joelson (In re Joelson*), 427 F.3d 700 (10th Cir. 2005)                14

*In re Chase*, 372 B.R. 133 (Bankr. S.D.N.Y. 2007)                26

*In re Chivers*, 275 B.R. 606 (Bankr.D.Utah 2002), aff'd, *Chivers v.
Skull Valley Band of Goshute Indians*, 2004 U.S. Dist.
LEXIS 12270 (D.Utah 2004)                15, fn. 8

*Cho Hung Bank v Kim (In re Kim)*, 62 F.3d 1511 (9th Cir. 1995)                27

*In re Delong,* 2014 WL 4059790 (Bankr. N.D.Ga. 2014)                25

*Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir. 1994)                19

*Field v. Mans*, 157 F.3d 35 (1st Cir. 1998)                                              27

*Field v. Mans*, 516 U.S. 59 (1995)                                                      24

*In re Foxworth*, 2004 Bankr. LEXIS 1205 (Bankr.N.D.Fla. 2004)                            20

*In re Goodrich*, 999 F.2d 22 (1st Cir. 1993)                                             27

*In re Greenidge*, 75 B.R. 245 (Bankr. M.D.Ga. 1987)                                      28

*Grogan v. Gardner*, 498 U.S. 279 (1991)                                              12, 19

*In re Husman*, 2013 WL 5134539 (Bankr. W.D.Pa. 2013)                                     26

*Int'l Fidelity Ins. Co. v. Baxter (In re Baxter)*, 294 B.R. 800
    (Bankr. M.D. Ga. 2003)                                                                27

*In re Joelson*, 307 B.R. 689 (10th Cir. 2004)                                         14, 16

*In re Kaspar,* 125 F.3d 1358 (10th Cir. 1997)                                            17

*Matter of McFarland*, 84 F.3d 943 (7th Cir.), cert. denied, 519 U.S. 931 (1996)  27

*Monger v. Cessna Aircraft Co.*, 812 F2d 402 (8th Cir. 1987)                           8, fn. 4

*Matter of Norris*, 70 F.3d 27,  29 n.6 (5th Cir. 1995)                                   27

*In re Olinger*, 160 B.R. 1004 (Bankr. D. Ind. 1993)                                      15

*Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir. 1997)                                     20

*The Pinkerton and Laws Co., Inc. v. Roadway Express, Inc.* 650 F. Supp. 1138
    (N.D. Ga. 1986)                                                                       23

*In re Sansoucy*, 136 B.R. 20 (Bankr.D.N.H 1992)                                       15, fn. 8

*Schweig v. Hunter (In re Hunter),* 780 F.2d 1577 (11th Cir.1986)                         12

*Thompson v Smith Barney, Harris Upham & Co., Inc.,* 539 F. Supp. 859
    (N. D. Ga. 1982)                                                                      23

*In re Tucci*, 462 B.R. 278 (Bankr. D. Mass. 2011)                      15

*United States v. Wilson,* 433 F. Supp. 57 (N.D. Iowa, 1977), *vacated on
     Other grounds*, 575 F2d 620 (8th Cir. 1978), *vacated on other
     grounds*, 442 U.S. 653 (1979) and *vacated on other grounds*, 443
     U.S. 902 (1979)                                                    8, fn. 4

*In re Vann*, 67 F.3d 277 (11th Cir. 1995)                             13, fn. 5

*In re Volpentesta*, 187 B.R. 261(Bankr. N.D .Ill. 1995)              19

*Wolf v. Campbell (In re Campbell)*, 159 F.3d 963 (6th Cir. 1998)     27,28

*Woodall*, 175 Ga. App. 83 (1985)                                     22

*In re Wube*, 2013 WL 1137108 (Bankr. D.D.C. 03/19/13)                18

<u>*Statutes and Rules*</u>

11 U.S.C. § 523(a)(2)(A)                                              15, 18, 19, 27

11 U.S.C. § 523(a)(2)(B)                                              15, 16, 18

Fed, Rule of Evid. 302                                                8, fn. 4

O.C.G.A. § 23-2-53                                                    22

O.C.G.A § 23-2-58                                                     21, 22

O.C.G.A. § 24-4-23                                                    8, fn. 4

W. Prosser, <u>Law of Torts</u> § 108, (4th ed. 1971)               24

## STATEMENT OF THE CASE

Appellant correctly states that findings of fact by the Bankruptcy Court are subject to a "clearly erroneous" standard of review.  The Bankruptcy Court's findings in this case, including its findings as to Appellant's lack of credibility, were correct and certainly not "clearly erroneous."

### A. Statement of Facts

Appellee has a judgment for $104,179.60 plus interest for fees and expenses incurred in successfully representing Debtor/Appellant Scott Appling and his company, Hartwell Enterprises, Inc. ("Hartwell Enterprises") in a lawsuit.  Am. Compl., ¶ 2 (R3-66); Order and Judgment (R5-115).[1]  As a result of Appellee's efforts, Appellant and Hartwell Enterprises avoided payments of over $21,000 a month while the suit was pending, his and Hartwell Enterprises' debt was decreased by over $1,500,000 and he avoided the acceleration of over $2,000,000 in debt secured in part by his and his mother's personal assets.  (R3-165); Am. Compl., ¶ 7.  (R3-67-68).

Specifically, Appellant and Hartwell Enterprises purchased a business in June, 2004, and the first monthly payments to the seller and broker in the purchase transaction were due in late July, 2004.  (R3-165).  Am. Compl., ¶¶ 4, 5.  (R3-66-67).  Upon taking over the business, Appellant believed that he had been

---

[1] As stated in Appellant Br., fn 1, the record on appeal is Docket Nos 3, 5, 6 and 7.

1

defrauded in the purchase of the business and retained Appellee and attorney
Walter Gordon of Hartwell, as local counsel, to represent him and Hartwell
Enterprises against the seller of the business and the broker.  (R3-165-166, 177,
211, 289-290).

Appellee immediately filed a lawsuit on behalf of Appellant and Hartwell
Enterprises in July, 2004 before any monthly payments were due to the seller and
broker.  *Hartwell Enter. Inc., et al. v. Herrington Seating, Inc*., *et al*., No. 04-FV-
528-J/H (Franklin Super., Ga.) (the "*Hartwell Enter.* lawsuit").  Am. Compl., ¶ 5.
(R3-67).  Appellee sought and obtained a temporary restraining order and
subsequent preliminary injunction, which injunction allowed Appellant and
Hartwell Enterprises to operate the business without having to make <u>any</u> payments
to the *Hartwell Enter.* lawsuit defendants during the pendency of the lawsuit. (R3-
171).  This saved Appellant having to pay more than $21,000 a month and
prevented the acceleration of over $2,000,000 in debt.  (R3-167, 171); Am.
Compl., ¶ 7. (R3-67).

Ultimately, the case was settled against all defendants (the last being in
March, 2006), with a savings to Appellant and Hartwell Enterprises of more than
$1,500,000.  (R3-171, 176, 187, 200-201, 203); Am. Compl., ¶ 10. (R3-69).

Pursuant to its fee agreement with Appellant and Hartwell Enterprises,
Appellee generally billed them on a monthly basis for attorneys' fees and

expenses. (R3-211-212, 223); Fee Agreem., Pl. Ex. 1 (R5-94 [Doc. 5-1,5]); Am. Compl., ¶ 6. (R3-67).   As of March, 2005, Appellant and Hartwell Enterprises were delinquent in payment of Appellee's invoices in the amount of $66,710.57 in fees and expenses (the "past due amount"). (R3-184, 215); Am. Compl., ¶8.  (R3-68).

On March 8, 2005, Appellant sent an email to Appellee complaining about fees and costs, the progress of the litigation and concluding with a derogatory joke about lawyers.  (R3-213); Email, Pl. Ex. 2 (R5-100-101 [Doc. 5-1, 11-12]).  In response, by letter from Robert Lamar of Appellee law firm dated March 9, 2005, Appellee advised Appellant that it would have to withdraw from its representation of him and Hartwell Enterprises if Appellee's past due fees and expenses were not brought current.  (R3-214-215); Letter, Pl. Ex. 2 (R5-97-99 [Doc. 5-1, 8-10).  At a meeting several days later (the "March meeting"), Appellant told Mr. Lamar that Appellant shortly would receive a tax refund in excess of $100,000 (the "tax refund") that would be sufficient to pay all of Appellee's outstanding fees and expenses.  (R3-216, 228-229).

Appellant specifically promised that if Appellee would forgo immediate collection of the past due amounts and continue to represent him and Hartwell Enterprises, that he would pay all past due amounts and future legal expenses of Appellee from the tax return as soon as he received it.  (R3-215-217).  Based upon

this representation, Appellee did not attempt to collect the past due amount, did not withdraw from representing Appellant and Hartwell Enterprises, continued representing them, and incurred additional fees and expenses in the amount of $25,885.50 ($50,334.69 including interest at the contractually agreed rate). (R3-216, 217); Am. Compl., ¶ 10. (R3-69).

There is no dispute that Appellant represented to Appellee at the March meeting that he would be receiving a tax refund in excess of $100,000. Appellant so admitted in Paragraph 9 of his Answer to Appellee's Amended Complaint. (R3-119). Walter Gordon unequivocatively testified: "He told us he was getting a hundred thousand dollars." (R3-185, 192). Robert Lamar also so testified. (R3-216, 228-229).

Appellant specifically chose the misrepresented tax return amount of $100,000 because, as he testified, at the time of the March meeting, "I owed them both [Appellee's firm and the Gordon Firm] almost a hundred thousand dollars." (R3-310).

Appellant knew that the tax return would be substantially less than $100,000 at the time the misrepresentation was made, or, at best, had no rational basis to make a specific representation that he would receive a $100,000 refund.  Appellant testified that he called his accountant prior to the March meeting and that his accountant came up with the $100,000 tax refund amount by using "numbers" that

4

Appellant provided to the accountant from his 2002 W-2. (R3-342, 344); Def. Ex. 18 (R5-125 [Doc. 5-2, 3]).[2] That 2002 W-2, according to Appellant's own testimony, listed the amount of money he had paid in federal taxes in 2002 -- "$64,000." (R3-380). Appellant also admitted that he knew that he had only paid $64,000 in 2002 taxes prior to calling his accountant because he looked at the W-2 prior to the call. (R3-384). Appellant further admitted that, although his wife's income was not included in his W-2," this [the amount on his 2002 W-2] obviously was the bulk of the money." (R3-381).

Appellant specifically admitted that, at the time of the March meeting, he "certainly [was] aware of how much [he] had paid in 2002." (R3-383-384). And that amount, according to the W-2, was $64,000. (R3-384).

Appellant thus knew in March 2005 that he could not obtain a federal tax refund of $100,000 from taxes paid in 2002 and 2003[3] if the "bulk of the money" paid in taxes (and to be recovered) was $64,000. Further, Appellant's hearsay testimony that his accountant estimated that he would receive a $100,000 refund,

_____

[2] The testimony regarding his conversation with his accountant, even if true, was inadmissible hearsay and did not provide a reasonable basis for an unqualified, specific representation that he was going to receive a $100,000+ refund. Appellant could have called his accountant as a witness, but did not.

[3] Appling further testified that he did not know how much he paid in taxes in 2003, but that he and his wife filed a joint return in 2003 listing "total income of about $58,000 for the year, maybe $60,000." (R3-381).

based upon the W-2 showing he had only paid $64,000.00 in taxes in 2002, was not credible.

In a further, separate misrepresentation by Appellant – as consistently testified to by Mr. Lamar – Appellant represented that the tax return had already been prepared at the time of the meeting. (R3-216, 229). Further, Mr. Lamar testified that if he had known at the March meeting that either the refund amount was approximate or the return was not prepared, "we [Appellee] would have withdrawn at that point in time." (R3-229).

The 2002 amended tax return was dated June 15, 2005. (R3-227, 228, 231, 345); Return, Pl. Ex. 9 (R5-109 [Doc. 5-1, 20]).  Not surprisingly, the amended tax return lists the amount of tax paid by Appellant in 2002, on line 6, as $64,902. (R3-380). And, the actual amount of refund requested in the June 15 amended 2002 tax return was $60,718. (R3-228). Appellant admitted that he "knew in June when [he] signed it [the amended 2002 tax return], it wasn't going to be a hundred." (R3-346). The June amended return was rejected, the return was refiled and the actual refund amount, received by Appellant in October 2005, was $59,851. (R3-408-411); IRS letter, Pl. Ex. 9 (R5-114 [Doc. 5-1, 25]).

In a meeting on November, 2005 (the "November meeting"), Appellant renewed his promise that he would pay Appellee from the 2004 tax refund and

6

Appellee therefore continued working and completed settlement of the *Hartwell Enter.* lawsuit in March, 2006. (R3-217, 220); Am. Compl., ¶14. (R3-71-72).

Despite acknowledging that he clearly knew in June that the tax refund amount would be substantially less than $100,000, Appellant testified that he never advised Appellee (or Mr. Gordon) before the November meeting that the refund was not going to be in the amount represented to them in March nor did he advise them of the actual amount of the refund. (R3-395-396). Mr. Lamar testified that he first learned that the refund amount was not for the amount represented in the March (2005) meeting through discovery in this case. (R-329). Mr. Gordon testified similarly. (R3-169).

Appellant claims (but Appellee disputes) that he advised Appellee that he had received the tax refund at the November 2005 meeting.  In contrast, Mr. Lamar testified that he first learned that Appellant had received the tax refund in June of 2006. (R3-220-221, 225-227). Upon so learning, Mr. Lamar sent a demand letter to Appellant dated June 26, 2006, stating: "We have now learned through you that there was, in fact, a tax refund applied for and obtained by you . . ." (R3-222-223); Letter, Pl. Ex. 3 (R5-103-105 [Doc. 5-1, 14-16]).  On July 19, 2006, Appellant wrote a letter in response, but did not dispute the above statement regarding Mr. Lamar having just learned about receipt of the tax refund. (Pl. Ex. 4 (R5-107-108 [Doc. 51, 18-19]). To the contrary, Appellant stated in the July 19 letter regarding

the refund that "It should be obvious as to what I chose to do since we are still open." *Id.* That language did not dispute Mr. Lamar's statement and in fact confirmed that Appellant had not previously told Appellee of his receipt of the tax refund.

Mr. Lamar's June 26 letter also recited that, in the March 2005 meeting, Appellant "represented to our firm . . . that you [Appellant] were entitled to a refund of taxes from the IRS which would be sufficient to cover all of our outstanding and anticipated invoices, and you promised to utilize that refund when received to pay our outstanding and future invoices. Based upon that representation and that agreement . . . this Firm did not withdraw from your representation and continued our work, achieving ultimate settlement of your claims." (R3-222; R5-105).  Appellant, in his July 19 letter (R5-107-1-8), did not dispute this fact.[4]

Mr. Gordon similarly testified that he first learned in June of 2006 that Appellant had received the tax refund. (R3-170-173). Mr. Gordon also testified

---

[4] Under Georgia law, O.C.G.A. §24-4-23, Appellant's failure to answer the statements in Appellee's June 26 letter constitutes a presumption that he admitted the propriety of the statements and adopts them.  Under federal law, the effect of presumptions is a substantive question requiring application of state law under Rule 302. *Monger v. Cessna Aircraft Co*., 812 F.2d 402 (8th Cir. 1987).  Under Rule 302, in a civil action or proceeding, the state law supplies the rule of decision with respect to a claim or defense.  State law also determines the effect of presumptions respecting a fact which is an element of such claim or defense. *United States v. Wilson,* 433 F. Supp. 57 (N.D. Iowa, 1977), *vacated on other grounds*, 575 F2d 620 (8th Cir. 1978), *vacated on other grounds*, 442 U.S. 653 (1979) and *vacated on other grounds*, 443 U.S. 902 (1979).

8

that he was never advised by Appellee prior to the resolution of the underlying lawsuit (in March 2006) that Appellant had in fact received the tax refund. (R3-169-170, 173-174).

Mr. Lamar testified that at the November meeting he asked Appellant about the status of the tax refund and that the Appellant "represented to us that it had been screwed up, that . . . the CPA had either not filed it or somehow misfiled it, and that he had to go back himself and refile it, and he still hadn't gotten the refund, but he expected it at any time." (R3-219). Further, that the November meeting broke up and Mr. Lamar  " was disappointed that we didn't have fees, but we agreed to move forward based upon his representation that he was still waiting on his refund check, and then he would give it to us -- apply it to our fees when he got it . . ." (R3-220).

Appellant incredibly claimed that he told Mr. Lamar at the November meeting that he had received the check.  But when asked by the Court "Did you tell Mr. Lamar at that meeting that you had received the check in that amount [$59,851]?" Appellant rambled and did not answer the question. (R3-412). The Court followed up and asked: "Did you tell him how much it was?" Appellant incredibly stated:  "I don't really recall whether I did or not." *Id.*

Appellant's wife, at least as to this point, truthfully answered the Court's question during her testimony about the November meeting (which she attended).

9

She was asked by Appellant's counsel if in November 2005 she knew how much the refund was. She testified that she "knew how much it was." She was then asked: "Did [Appellant] tell Lamar how much it was in November, 2005?" She responded: "No." (R3-423-424).

Appellant twice testified that the IRS did not receive his June 15 amended tax return:

- After his accountant mailed his return in June 2005, Appellant testified that "I waited . . . and did not hear anything. . . . So I called the IRS myself. . . . It just -- it -- the IRS never received it." (R3-307).

- "I advised you that the tax return had been lost in the mail and I had to refile it. I notified you personally of that." (R3-396).

The Court picked up on these misstatements at trial and questioned Appellant about his "lost tax return" testimony. Directing the Appellant to Pl. Ex. 9, the amended return, the Court noted it was file stamped by the IRS "received June 20, 2005." The Court then asked: "Well, your testimony is, is that the tax return was never received by the IRS, but this would suggest that it, in fact, was received by the IRS on June 20, 2005. Do you have a response to that?" (R3-408). The discussion continued with Appellant's corrected testimony regarding the June 15 return not being lost, but rather the return having been rejected by the IRS in July, and then the return being resent to the IRS, <u>after</u> it had been initially rejected, in August. (R3-408-411).

10

## SUMMARY OF THE ARGUMENT

Appellee, a law firm, filed a Complaint to contest the dischargeability of its legal fees by Appellant in the Bankruptcy Court.  The Bankruptcy Court found that Appellant made false representations and omissions regarding a specific asset, Appellant's tax refund, for payment of Appellee's past and future legal fees – to which Appellee justifiably relied to its detriment.  Based upon Appellant's misrepresentations and silent omissions about the tax return, Appellee extended credit to Appellant, did not pursue collection of its debt and continued its successful representation of Appellant to the conclusion of the case.

The Court found that the debt was non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).  The Court properly found that Appellant's misrepresentations were fraudulent and rejected Appellant's arguments that his misrepresentations were as to a future act. The court's findings were correct and not "clearly erroneous," the standard of review for findings of fact.

The Court's Order should be affirmed.

## ARGUMENT AND CITATION OF AUTHORITIES

### 1.  The Bankruptcy Court Correctly Determined That Appellee has a Non-Dischargeable Claim Against Appellant

Appellant misstates the facts and law in this section of his argument.  As regarding the facts, Appellee relies upon the preceding Statement of Facts regarding Appellant's representations and omissions as to the tax refund.  The

11

Bankruptcy Court correctly found that those representations were false at the time made, and continued to be false because of Appellant's failure to disclose receipt of, and the lesser amount of, the tax refund.  Contrary to Appellant's assertion, they were not representations or promises as to a future act.  Unlike many of the cases cited by Appellant where the court factually found no fraudulent intent or omissions, here the court found fraudulent intent after hearing the evidence.  That interpretation was correct and not clearly erroneous.

The *Schweig* case cited by Appellant is inopposite as there the debtor "failed to allege any express affirmative misrepresentation."  *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986), *Id*. at 1579.  There, the debtor failed to affirmatively disclose gambling debt. *Id*.  *Schweig* also was abrogated by the Supreme Court in *Grogan v. Garner*, 498 U.S. 279 (1991).  *Schweig* relied upon the incorrect standard of "clear and convincing evidence" to prove the debtor's culpability.  *Id*. at 1579. Whereas *Grogan* held that "the standard of proof for the dischargeability exceptions… is the ordinary preponderance of the evidence standard."  *Id*. at 291.

Similarly when citing *Allison v. Roberts,* 960 F.2d 481 (8th Cir. 1992), Appellant misstates that the "alleged misrepresentation" by Appellant "concerns the promise of a future act..." Appellant Br. at 6.  However, here the Court found a

12

current false representation and omissions. The Court's factual finding is correct and not clearly erroneous.[5]

Ironically, in the *Bucciarelli* case cited by the Appellant (Appellant Br. at 9), the court found the debt non-dischargeable as in this case. In *Bucciarelli*, the attorneys, like here, relied upon their client's false statement she would pay their fees. The court then stated: "As the debtor is unlikely to admit that she made a promise without the intent to perform or that she made a false statement or omission with the intent to deceive the creditor, the court is permitted to infer such fraudulent intent from the facts and circumstances of the case." *In re. Bucciarelli*, 429 B.R. 372, 375-376 (N.D. Ga 2000).

Here the court properly inferred Appellant's fraudulent intent.

**2.  The Bankruptcy Court Correctly Ruled That Appellant Made a False Representation as to a Specific Asset, Not as to his "Financial Condition."**

The primary cases cited by Appellant (Appellant Br. at 11) are unavailing for several reasons.[6] First, as held by the court below, at least as to the holdings

---

[5] *Allison* was rejected by the 11th Cir. on other grounds. *In re Vann*, 67 F.3d 277 (11th Cir. 1995). In *Vann*, the court adopted the standard of justifiable reliance and rejected the standard of actual reliance employed by the Fifth Circuit in *Allison*.

[6] *In re Sharpe,* 351 B.R. 409, 425-426 (Bankr.N.D.Tex. 2006) (multiple false representations made by the debtor, including debtor's representation that "he had funds available to repay her hidden away pending his divorce." ); *In re Callaway,* 2006 WL 6589022, *34 (Bankr.N.D.Ga. 2006) (false representation that debtor would receive $400,000 to $500,000 per year in trust distributions).

therein asserted by Appellant, the cases have been abrogated by subsequent

appellate decisions.  The holding in *Baker v. Sharpe (In re Sharpe)* was abrogated

by the Fifth Circuit Court of Appeals in its decision of *Bandi v. Becnel (In re*

*Bandi),* 683 F.3d 671 (5th Cir. 2012), *cert. denied* 133 S. Ct. 845 (2013).  In

*Bancorpsouth Bank v. Calloway (In re Callaway)* cited by Appellant, the Court

held that the "strict interpretation" standard urged by Appellee herein was the

correct standard to apply, but then relying upon the Bankruptcy Appellant Panel

holding *In re Joelson*, 307 B.R. 689, 696 (10th Cir. 2004), held that the

representation by the debtor in *Calloway* was concerning his general financial

condition.  However, the Bankruptcy Panel holding relied upon by the *Callaway*

court was subsequently reversed by the Tenth Circuit's holding in *Cadwell v.*

*Joelson (In re Joelson)*, 427 F.3d 700 (10th Cir. 2005).[7]  Appellee respectfully

submits that the Bankruptcy Court below both correctly declined to follow the

*Sharpe* and *Calloway* holdings urged by Appellant and properly adopted the

"strict interpretation" analysis as followed by courts in the Fifth, Eight, Tenth

Circuits and numerous other courts.  *See*, Opinion at 5-10. (R3-137-142).

Here, both parties agree that the Appellant accurately represented that he

had <u>one</u> specific asset (i.e., a tax refund) which was sufficient to pay all his

---

[7] Appellee adopts by reference the detailed analysis below by the Bankruptcy
Court of these cases – which analysis Appellant does not even acknowledge, much
less address. *See*, Opinion, at 8-10. (R3-140-142).

obligations to Appellee.  *Compare* Appellee's Initial Complaint, ¶ 8 (R3-14) *with* Appellant's Answer, ¶ 8 (R3-62).  Thus, there was no requirement under 11 U.S.C. §523(a)(2)(B) that Appellant's representation of  existence of the asset be in writing.  This case does not involve a false statement concerning the debtor's overall financial condition within the ambit of 11 U.S.C. §523(a)(2)(B).  Rather, it centers upon the debtor's pledge of an asset which everyone agrees actually existed.

A statement representing the existence of a single asset, has almost uniformly been held not to constitute "a statement respecting the debtor's or insider's financial condition" under 11 U.S.C. §523(a)(2)(A) and (B).  *See, e.g., Bandi v Becnel (In re Bandi)* 683 F.3d 671, 676 (5th Cir. 2012); *In re Tucci*, 462 B.R. 278, 283 (Bankr. D. Mass. 2011) ("the narrow definition of 'financial condition' is the proper interpretation of 11 U.S.C. § 523(a)(2)(B)….  Applying the narrow definition to the present case, the Statement of Ownership does not qualify as a statement of financial condition because it was a statement of ownership of a single asset, and not an assessment of the Debtor's overall financial health.").[8]

---

[8] *Accord, In re Chivers*,  275 B.R. 606, 615 (Bankr.D.Utah 2002), *aff'd, Chivers v. Skull Valley Band of Goshute Indians*, 2004 U.S. Dist. LEXIS 12270 (D.Utah 2004); *In re Alicea*, 230 B.R. 492, 503 (Bankr.S.D.N.Y. 1999); *In re Olinger*, 160 B.R. 1004, 1009 (Bankr.D.Ind. 1993); *In re Sansoucy*, 136 B.R. 20, 23 (Bankr.D.N.H 1992).

In his Brief, Appellant omits the *Callaway* court's approval of the "strict interpretation" approach as to what constitutes statements of "financial condition" which fall within the purview of 11 U.S.C. § 523(a)(2)(B): ". . . <u>the Court</u> concurs with the reasoning of the Tenth Circuit Court of Appeals in [*In re Joelson*, 307 B.R. 689, 696 (10th Cir. BAP 2004), *cert. den.* 2006.] and also <u>agrees that a strict approach is preferable to an overly broad approach</u>, . . . ." *Id*., 2006 WL 6589022, *21 (emphasis supplied). The *Callaway* court went on to recognize "a trend in the case law" quoting the *Joelson* court's characterization of the types of statements with which § 523(a)(2)(B) is concerned:

> [S]tatements excluded from the reach of section 523(a)(2)(A) [are required] to be "financial-type statements including balance sheets, income statements, statements of changes in financial position, or income and debt statements that provide what may be described as the debtor or insider's net worth, overall financial health, or equation of assets and liabilities."

*Id.*

In *Bandi v. Becnel, supra*, the Fifth Circuit confirmed the "trend in the case law" and clearly adopted the "strict approach" and defined what constituted it:

> The term 'financial condition' has a readily understood meaning. It means the <u>general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities</u>.  A representation that one owns a particular residence or a particular commercial property says nothing about the overall financial condition of the person making the representation or the ability to repay debt.

*Id.*, (emphasis supplied).[9]

Interestingly, another holding in the *Callaway* decision supports the validity of Appellee's claim herein.  Contrary to the allegedly <u>false</u> representation concerning the purported trust income in *Callaway*, the court, also addressed a representation similar to the one before the Court here.  In *Callaway*, everyone agreed that the debtor was going to receive and did in fact receive a $350,000 loan from the plaintiff.  The debtor promised to utilize the loan proceeds to pay 50% of a $700,000 obligation to a third party.  Although the court found that the representation was true when made, before the loan closed, the third party had already reduced the $700,000 debt by 50% but, the debtor did not inform the Appellee of the debt reduction and the debtor did not in fact use the $350,000 loan to pay down the debt to the third party.  The *Callaway* court found that, "considering the totality of the circumstances," the debtor had no intention of using the loan proceeds to pay down the third party debt and found the debt non-dischargeable. *Callaway, supra,* at 23-24.

The *Kaspar* case, cited by Appellant is also inapplicable.  (Appellant Br. at 11), citing *In re Kaspar,* 125 F.3d 1358, 1361 (10th Cir. 1997).  *Kaspar* involved a

---

[9] Appellant's reliance upon *In re Sharpe*, *supra,* is also unavailing because there, the debtor made <u>numerous</u> allegedly false representations regarding his overall financial condition which the creditor relied upon – one of which included that he had hidden some cash. The only statement made by Appellant at issue here regarded the existence of one specific asset – not any other ability to pay.

representation regarding the debtor's financial condition, and therefore was governed by 11 U.S.C. § 523(a)(2)(B) – which requires a writing. *Id.* at 1359. Here, the court found a fraudulent intent as to a specific asset, which is governed by § 523(a)(2)(A), which does not require a writing.

Appellant's citation to *In re Wube*, 2013 WL 1137108 (Bankr. D.D.C. 3/19/13) is unavailing as well. In *Wube*, an unpublished D.C. Bankruptcy Court decision, the court did not endorse either the "strict" or "broad" interpretations approach. Instead, it addressed the nature of the "asset" at issue – a nightclub – and held that given the total lack of any information conveyed about the viability, cash flow or profitability of the club, "no lender could reasonably rely upon it." *Id.*, at *3. Simply stated, *Wube* is not applicable to this case.

The "totality of the circumstances" in this case clearly supports the Bankruptcy Court's finding that Appellee's judgment/claim was non-dischargeable.

### 3. The Bankruptcy Court Properly Found Appellee's Claim Non-Dischargeable Because of Appellant's False Pretenses, False Representations and/or Actual Fraud.

Appellant argues the law about "future acts" but again ignores that the Court here found that Appellant had current fraudulent intent. That finding, as noted, is correct and not "clearly erroneous."

Although the discharge of preexisting debt is a primary tenet of bankruptcy law, "a separate equitable policy mandates that any such mechanism for an unencumbered fresh start only should redound to the benefit of those debtors who are unfortunate, yet honest." *Grogan v. Gardner, Id.*at 286-87. Thus, the Bankruptcy Code provides for the non-discharge of debt obtained by false pretenses, false representations and/or actual fraud.  11 U.S.C. §523(a)(2)(A).

"A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive."  *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir. 1994).  Appellant's analysis of conduct which may rise to the level of false pretenses, false representations and/or actual fraud overlooks that a statement made "with reckless disregard for the truth" constitutes a willful misrepresentation under 11 U.S.C. §523(a)(2)(A).  *See, e.g., In re Volpentesta*, 187 B.R. 261, 271 (Bankr. N.D. Ill. 1995).  Moreover, "[w]here the debtor has possession of material information that may bear on the creditor's willingness to extend a financial accommodation to him; knows that the creditor would consider it; fails to disclose it; creates or allows the creation of the semblance of a very different state of affairs; and reinforces that imposture by withholding of the material information, the debtor has acted in a way to trigger § 523(a)(2)(A)."  *In*

19

*re Foxworth,* 2004 Bankr. LEXIS 1205, *8 (Bankr. N.D. Fla. 2004) (quoting *In re Anderson,* 181 B.R. 943, 948 (Bankr. D. Minn. 1995)).

The First Circuit U. S. Court of Appeals, in *Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir. 1997), accurately describes the factors the Court should consider in a case like this, when determining whether a misrepresentation is sufficient to make a debt non-dischargeable.  In *Palmacci*, the claimant agreed to invest $75,000 in a venture based upon the debtor's representation that the debtor would himself invest $75,000 in the venture and the funds would be placed in a trust.  It was alleged the debtor did not invest his $75,000 as promised and that his representation that he would do so was fraudulent because of the debtor's "reckless indifference to the truth" as to whether he would actually be in a position to fulfill his promise in the future.  *Id*., at 788.

The Court of Appeals held that the issue was whether the debtor "in good faith intended to keep his promise" when he made it.  Importantly, the Court held that in determining whether the debtor had a "good faith belief" at the time he made the representation that he would perform it, the fact finder could look to "the very unreasonableness of the belief [as] strong *evidence* that it does not in fact exist."  *Id*., at 788 (emphasis in original).  "[I]ntent to deceive may be inferred from the totality of the circumstances, including inferences from circumstantial facts." *Id.*, at 790.

"Among the circumstances from which scienter may be inferred are: the Appellant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance." *Palmacci*, *supra*, at 789.  The court should focus upon "whether the surrounding circumstances or the debtor's actions 'appear so inconsistent with his self-serving statement of intent that the proof leads the court to disbelieve the debtor.' " *Id.* (citation omitted).

Appellant misstates the scienter requirement in fraud or false pretense cases such as this, citing *Bullock v. Bankchampaign*, 133 S.Ct. 1754 (2013).  *Bullock* involved "defalcation," which is a breach of fiduciary duty and may include non-fraudulent breaches of fiduciary duty.  *Id.* at 1760.  The Court limited the higher scienter requirement to defalcation cases involving trustees for policy reasons, not wishing to hold "<u>nonprofessional</u> trustees," for example, to the lower scienter standard when "potentially immersed in interfamily arguments that are difficult to evaluate in terms of comparative fault." *Id* at 1761.  The scienter holding was specifically not extended to fraud cases such as this.  *Id*., at 1760.

Under Georgia law, "Confidential relations" is statutorily defined as: "Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another <u>or where, from</u>

21

a similar relationship of mutual confidence, the law requires the utmost good faith,
such as the relationship between partners, principal and agent, etc." (Emphasis
added). O.C.G.A §23-2-58.  Appellee submits that it had a relationship with
Appellant of mutual confidence and trust and had "the right to expect full
communication of the facts" from Appellant.

Moreover, even in the absence of a confidential relationship, the duty to
disclose may arise from the particular circumstances of the case.  O.C.G.A. §23-2-
53, "Suppression of Fact as Fraud," provides:  "Suppression of a material fact
which a party is under an obligation to communicate constitutes fraud.  The
obligation to communicate may arise from the confidential relations of the parties
or from the particular circumstances of the case." (Emphasis added.)

"Generally, a claim for fraud for nondisclosure of material facts may arise in
the absence of a fiduciary relationship when the allegedly defrauding party actively
conceals a latent defect or intrinsic quality that the other party cannot easily
discover, or when one knowingly takes advantage of another who is 'laboring
under a delusion' regarding the true facts . . . Concealment of a material fact may
constitute fraud 'when from any reason one party has a right to expect full
communication of the facts from another.' *Woodall,* 175 Ga. App. at 84-85, 332
S.E.2d at 175 (quoting *Brinsfield v. Robbins,* 183 Ga. 258, 270, 188 S.E. 7 (1936)."

*The Pinkerton and Laws Co., Inc. v. Roadway Express, Inc.,* 650 F. Supp. 1138, 1147 (N.D. Ga. 1986).

"Similarly, one who takes advantage of a party he knows to be laboring under a delusion may be liable for fraud, even absent a fiduciary relationship." *Thompson v. Smith Barney, Harris Upham & Co., Inc.,* 539 F. Supp. 859, 864 (N. D. Ga. 1982) (citation omitted).

The Court found that in the particular circumstances of this case, Appellant, having represented to Appellee that he would receive a tax refund of $100,000 and use it to pay Appellee's legal fees, and knowing that Appellee was continuing to work on Appellant's behalf in reliance on the promise, had a duty to fully communicate the facts as to the actual tax refund amount and its status to Appellee. Stated differently, Appellant took advantage of Appellee, knowing that Appellee was laboring (on Appellant's behalf) under the delusion that the tax refund would be $100,000 and would be used to pay Appellee.

Here, there are ample circumstances for the Court to have found that Appellant intended to defraud Appellee or pledged his tax refund proceeds to Appellee with reckless disregard for the truth or falsity of his statement, including:

- Appellant's knowledge at the time he made the promise that he had not paid sufficient taxes to obtain such a refund;

23

- The relatively short time period which elapsed between making the promise and breaching it;

- Failure to even attempt any performance;

- Failure to advise Appellee of his breach of promise while he knew Appellee was continuing to perform in reliance on his promise;

- His knowledge of the dire financial condition of business; and

- His failure to disclose material facts to Appellee regarding the dire condition and prospects for his business.

**4.   The Bankruptcy Court Correctly Found Justifiable Reliance by Appellee.**

"[J]ustifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that 'it is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Field v. Mans*, 516 U.S. 59, 71-72 (1995) (quoting W. Prosser, <u>Law of Torts</u> § 108, p. 718 (4th ed. 1971)).

Appellant argues that because Appellee had some knowledge about Appellant's general financial situation, it could not have justifiably relied upon Appellant's misrepresentation as to the tax refund.  Particularly, Appellant

24

Case 3:15-cv-00031-CAR   Document 11   Filed 07/02/15   Page 30 of 35

contends that Appellee did not know that the taxing authority would approve the refund, the amount of the refund or the timing of the refund.  Again, Appellant totally misses the point.  In fact, it appears undisputed that: (1) the refund was approved and sent to Appellant; (2) in an amount  sufficient to satisfy Appellant's invoices even if less than the $100,000 misrepresented amount; (3) was received (according to Appellant) before the November meeting  and before Appellee completed its work for Appellant (even if less than the $100,000 misrepresented); and (4) Appellant failed to disclose that he had received the tax refund, much less the amount, until after Appellee had successfully completed all work for Appellant. Nor is there any dispute that Appellant promised to pay Appellee from the refund proceeds. *Compare* Appellee's Initial Complaint, ¶ 8 (R3-14) *with* Appellant's Answer, ¶ 8 (R3-62).  Thus, it is immaterial whether Appellee wrote a letter confirming the Appellant's promise.

In the *Delong* case, unlike this case, the court made a factual finding that the debtor "…did not intend to pay [the creditor] at the time the representations were made." *In re Delong*, 2014 WL 4059790 *5 (Bankr. N.D.Ga. 2014).  The court also noted that, unlike here, it did "not have sufficient evidence of when [the debtor] made the last representation …to find that she continued to make the representation after she knew she was not going to be getting any further money..." *Id*. at *5, fn 4.

25

Similarly, the *Husman* and *Chase* cases cited by Appellant are distinguishable from this case. *In re Chase*, 372 BR 133 (Bankr. S.D.N.Y. 2007). *In re Husman*, 2013 WL 5134539 (Bankr. W.D.Pa. 2013). In both cases, the court found that the creditor had failed to prove fraudulent intent. Here, the court found, fraudulent intent. That finding is correct, not "clearly erroneous."

Here, the only thing Appellee justifiably relied upon was the word of its client that he would use whatever was necessary of his tax refund to pay Appellee's bills. Appellant does not explain why Appellee was not entitled to trust his narrow promise.

5. **The Bankruptcy Court Correctly Determined That Appellant's Entire Indebtedness to Appellee Is Non-dischargeable.**

Appellant claims that even if Appellant did intend to defraud Appellee and Appellee justifiably relied upon Appellant's misrepresentation, Appellee can only recover the fees and expenses incurred by Appellee after the false representation was made (i.e., $50,334.69, including interest at the contractual rate[10]) rather than the entire amount owed, including the past due amount Appellee did not attempt to collect at the time in reliance on Appellant's misrepresentation. Appellee has a judgment against Appellant for fees, expenses and interest (through September 24, 2012) in the amount of $104,179.60. (R5-115.) Appellee is entitled to have the entire judgment/debt deemed non-dischargeable.

---

[10] *See*, Am. Compl., ¶ 10. (R3-69).

26

"Section 523(a)(2)(A) disallows the discharge of an individual debtor from any debt 'for . . . <u>an extension, renewal, or refinancing of credit</u>, to the extent obtained by . . . false pretenses, a false representation, or actual fraud.'" *Field v. Mans*, 157 F.3d 35, 42 (1st Cir. 1998) (emphasis supplied). *Accord*, *Cho HungBank v Kim (In re Kim),* 62 F.3d 1511 (9th Cir. 1995) ("Fraudulently inducing a creditor's extension of due date on a credit is sufficient to support claim of non-dischargeability under 11 USCS § 523(a)(2)"); *Int'l Fidelity Ins. Co. v. Baxter (In re Baxter)*, 294 B.R. 800, 807 (Bankr. M.D. Ga. 2003).  It is not necessary for creditor to show that "new money" was lent to debtor.  *Id.*  "[A]n extension may be an 'increase in length of time' or 'an agreement on or concession of additional time'" to pay a debt.  *Field v. Mans*, *supra*, at 43.  Several Circuit Courts have held that "a refinancing or extension of credit" is sufficient without showing further damage.

A creditor need not also show that he could have collected on the loan prior to the bankruptcy but for the new extension of credit.  *Wolf v. Campbell (In re Campbell)*, 159 F.3d  963, 966-967 (6th Cir. 1998). *Accord, Matter of McFarland*, 84 F.3d 943, 947 (7th Cir.), *cert. denied*, 519 U.S. 931 (1996); *Matter of Norris*, 70 F.3d 27, 29 n.6 (5th Cir. 1995); *In re Goodrich*, 999 F.2d 22, 25 (1st Cir. 1993).  As stated by the Sixth Circuit Court of Appeals: "To hold otherwise would create a perverse incentive for insolvent debtors to lie to creditors to get them to forbear

27

collection of past due indebtedness and would remove the primary legal incentive for fair dealing -- namely, non-dischargeability in bankruptcy when a contract is induced by fraud." *Wolf v. Campbell*, *supra*, at 967.[11]

The *Greenridge* case cited by Appellant is also distinguishable. *In re Greenridge*, 75 B.R. 245 (Bankr. M.D.Ga. 1987). There the court found that the creditor's "…evidence was inadequate to prove that it forfeited any remedies or otherwise relied to its detriment on the Debtor's false financial statement in refinancing the earlier debt as it did in extending new credit. Therefore, this court finds that the refinanced portion of the debt is dischargeable." *Id*., at 247. Here the Court found that Appellee did rely to its detriment on the Appellant's false representations and omissions. In fact, the evidence was undisputed that Appellee forestalled any effort to collect the past due amount as a result of Appellant's promise to pay the past due amount from the tax refund when he received it. Appellee is thus entitled to recover the entire judgment amount.

## CONCLUSION

For the foregoing reasons, Appellee respectfully requests that the Opinion of the Bankruptcy Court in this matter be affirmed in its entirety.

---

[11] Even when a court has held the existence of some damage to the creditor is relevant, the burden is <u>not</u> on the creditor to prove that had it attempted collection, recovery would have been a virtual certainty. Rather, for the debtor "to preserve his own right to the 'fresh start' provided by bankruptcy, it was his burden . . . to have established affirmatively that acceleration would not have been a feasible choice." *Field v. Mans*, *supra,* at 46.

<u>/s/ David W. Davenport</u>
David W. Davenport
Georgia State Bar No. 205962

Lamar Archer & Cofrin
50 Hurt Plaza, Suite 900
Atlanta, Georgia
404- 577-1777
Email: dwdavenport@laclaw.net

## CERTIFICATE OF SERVICE

The within and foregoing was served electronically as follows:

Daniel Lewis Wilder
Law Offices of Emmett L. Goodman, Jr. LLC
544 Mulberry Street
Suite 800
Macon, GA 31201

This 1st day of July, 2015.

/s/ David W. Davenport
David W. Davenport
